# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
December 15, 2010 Session

## STATE OF TENNESSEE v. TIMOTHY L. DIGGS, SR.

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40700629      Michael R. Jones, Judge**

_____

**No. M2010-00025-CCA-R3-CD - Filed July 18, 2011**

_____

The defendant, Timothy L. Diggs, Sr., stands convicted of aggravated child abuse of a child under eight years old, a Class A felony, and felony murder. The trial court sentenced him as a violent offender to serve fifteen years for aggravated child abuse concurrently with a life sentence for felony murder in the Tennessee Department of Correction. On appeal, the defendant challenges the sufficiency of the evidence to support his convictions. Following our review, we affirm the judgments of the trial court, but we remand for a corrected judgment form for the felony murder conviction to properly reflect the defendant's life sentence.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed and Remanded**

J.C. MCLIN, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, J., and DAVID H. WELLES, Sp. J., joined .

Gregory D. Smith (on appeal), Roger Eric Nell, District Public Defender (at trial), and Charles Bloodworth, Assistant Public Defender, (at trial), Clarksville, Tennessee, for the appellant, Timothy L. Diggs, Sr.

Robert E. Cooper, Jr., Attorney General and Reporter; Benjamin A. Ball, Assistant Attorney General; Victor S. Johnson III, District Attorney General; and Steven Garrett, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### Background

On June 4, 2007, a Montgomery County grand jury indicted the defendant, Timothy L. Diggs, Sr., on three counts: (1) aggravated child abuse of a child under eight years old, a

Class A felony; (2) aggravated child neglect of a child under eight years old, a Class A felony; and (3) felony murder in the perpetration of aggravated child abuse or aggravated child neglect. A bench trial was held July 27-28, 2009.

Tammy Barker testified that she operated a childcare center and that the victim had attended the center for approximately four months before his death. She said that the center's policy was to not admit children after 9:00 a.m. Ms. Barker testified that on March 21, 2007, she received a call between 10:15 a.m. and 10:30 a.m. from an employee, who informed her that the defendant brought the victim and the victim's sister to the center after 9:00 a.m. The employee told the defendant that the center did not accept children after 9:00 a.m., and he left with the children. Ms. Barker testified that the victim was "a good child" and "easy-going."

Debbie Patterson, a 911 dispatcher in Montgomery County, testified that she received a 911 call on March 21, 2007, at 2:03 p.m., from a male who stated that he needed an ambulance for an injured child. She identified a recording of the call, which the state played for the court.

Clarksville Police Sergeant Charles Gill testified that he went to 18B Lincoln Homes on March 21, 2007, in response to an ambulance call "in reference to a welfare check on a two-year-old child." The defendant met him outside of the apartment and asked him where the ambulance was. The defendant showed him into the apartment, and he observed the victim on a couch, unconscious and having difficulty breathing. The victim's eyes were rolled back, and he had a faint pulse. Sergeant Gill also observed an infant lying on the living room floor and told the defendant to take care of that child. He monitored the victim until the ambulance arrived. He testified that Sergeant Vincent Lewis responded to the apartment within minutes of his arrival and took over the crime scene. Sergeant Gill drove the ambulance to the hospital.

Rita Peters, a paramedic employed by Montgomery County Emergency Medical Services, testified that dispatch sent her and her partner to 18B Lincoln Homes at 2:06 p.m. Dispatch had advised them that a child had fallen down the steps. When they arrived at 2:09 p.m., the victim was not breathing and had no pulse. They took him to their ambulance and began ventilation and CPR. They immobilized his neck and gave him epinephrine. When they arrived at the hospital, the victim had a pulse and blood pressure.

Latonya Peacher testified that in March 2007 she lived in Lincoln Homes. She knew Timothy Lopez Diggs, Jr.,[1] and said that he was at her house on March 21, 2007. Ms.

---

[1] Because the defendant and his son share the same name, we will henceforth refer to Timothy

(continued...)

-2-

Peacher testified that Lopez, whom she believed was fifteen or sixteen years old at the time, arrived at her house at approximately 11:00 a.m. that day and spent the day with her teenage relatives. She said that the teenagers would leave the house to go to the store or park and then return to the house. Ms. Peacher testified that when she saw the police and ambulance at the apartment where Lopez and the defendant were staying with the defendant's girlfriend, she told Lopez to go over there to see what was happening. After he discovered why the police and ambulance where there, he returned to Ms. Peacher's house. She said that he appeared shocked.

Clarksville Police Office Candice Daugherty testified that she responded to 18B Lincoln Homes on March 21, 2007. She said that when she arrived, other officers, the defendant, and an infant were the only other people present. Officer Daugherty was responsible for setting a perimeter around the apartment and taking the crime scene log. She testified that a juvenile male, whom she estimated to be fourteen or fifteen years old, approached her and requested to go inside the apartment. She described him as "very adamant" and "anxious or concerned." She said that she had to physically prevent him from going into the apartment. Officer Daugherty later learned that he lived in the apartment. After she stopped him, he stood on the sidewalk until another officer spoke with him.

Clarksville Police Officer Michael Dillon testified that he responded to 18B Lincoln Homes on March 21, 2007, at 2:07 p.m. Sergeant Gill was already present, and the defendant was in the living room caring for an infant girl. The paramedics had taken the victim out of the apartment. Officer Dillon testified that the defendant appeared "surprisingly calm" and reported that the victim had fallen down the stairs.

Dr. Adele Lewis, the assistant medical examiner for the state, testified that she performed the autopsy of the twenty-two month-old victim on March 24, 2007. Dr. Lewis testified that the victim had a skull fracture, brain swelling, brain bleeding, bleeding in his eyes, bleeding in the small bowel, and bruised lungs. She said that the injuries were consistent with non-accidental trauma such as striking, kicking, shaking, or throwing the victim. Dr. Lewis opined that the type of accidental trauma that would cause similar injuries would include a major car wreck or a three-story fall. She said that there was evidence that the injury to the victim's bowel occurred twelve to twenty-four hours before his death and was consistent with an injury caused by a foot or fist pressing the bowel against the spinal cord. Dr. Lewis testified that the "classic triad" of injuries associated with shaken baby syndrome were "brain injury, bleeding on the brain, and retinal hemorrhages." She said that in addition to those injuries, the victim also had a skull fracture that indicated "some kind of

---

[1](...continued)
Lopez Diggs, Jr., as Lopez, the name by which the witnesses knew him. We intend no disrespect by this procedure but do so to avoid confusion.

significant impact to the back of the head." Dr. Lewis testified that the victim's injuries were not consistent with falling down a staircase. She opined that the injuries would have manifested themselves immediately after the victim received them in "an alteration of the level of consciousness."

Lashawnda Peacher testified that on March 21, 2007, she was on spring break from school and was staying with her aunt, Latonya Peacher, in Lincoln Homes. She was fifteen at the time and was friends with Lopez, whom she believed was either fifteen or sixteen. Lashawnda Peacher testified that on March 21, 2007, Lopez arrived at her aunt's house between 8:00 a.m. and 9:00 a.m. She did not see him go to his house, 18B Lincoln Homes, until they saw the ambulance and police there. She testified that Lopez went to 18B Lincoln Homes to find out what happened, and he returned thirty minutes later. Lashawnda Peacher said that Lopez appeared shocked when he returned.

Alisa Libonn, a social worker in the Emergency Room at Vanderbilt Children's Hospital, testified that she was on duty on March 21, 2007. As part of a routine assessment, she and the victim's physician spoke with the defendant to gather information about what happened to the victim. The defendant told her that he and his fourteen-year-old son, Lopez, occasionally stayed overnight at the victim's house because he was dating the victim's mother. On March 21, he tried to take the victim and the victim's sister to daycare, but the daycare did not accept the children. He returned to the house with the children, and his son left to go to a neighbor's house when the defendant took the victim upstairs to put him down for a nap. The defendant said that after he put the victim down, he heard the victim's sister crying downstairs and went to check on her. While he was doing that, he heard the victim walking around upstairs. The defendant turned towards the staircase when he heard the victim approach the stairs, and he saw the victim fall down the stairs. He said that he tried to catch the victim, but the victim had fallen most of the way down the stairs and hit his head several times. The defendant picked up the victim, who was limp and did not move. He called 911 and started CPR. The defendant told her that his son was not at the house when the victim fell. He said that his son tried to come into the house after the police arrived, but the police would not allow him to come inside.

On cross-examination, Ms. Libonn testified that the victim's mother told her that she had called home at 12:00 p.m. on March 21, and Lopez answered the phone. Lopez told her that the defendant had left to mail a job application. The victim's mother called home again at 2:10 p.m., and the defendant answered. He told her at that time that he had not been able to leave the children at the daycare.

Steven Sean Briscoe testified that he met the defendant in the Montgomery County Jail. He recalled that they were discussing their cases and how they would try to beat the

charges when the defendant "broke down" and told him "how the incident took place." The defendant told him that he was high on PCP and that when the victim began crying, he "slammed the baby down" on the floor. The defendant said that he also kicked and hit the victim. Mr. Briscoe testified that the defendant told him that he planned to tell the authorities that someone tried to rob the house and hurt the victim. The defendant said he would blame the robbery on a man whom he met in a holding cell at the jail. Mr. Briscoe testified that the defendant's plan did not work because that man's mother gave him an alibi. Mr. Briscoe said that the defendant's next plan was to place the blame on his son. He testified that he encouraged the defendant to blame his son at first but later changed his mind when he thought about his own children. He said that the defendant also changed his mind about blaming his son because he "[did not] want to put his son through that kind of trouble." Mr. Briscoe said that the defendant told him that he had the victim's mother and grandmother fooled into believing that it was an accident but that he could not fool the victim's grandfather. Mr. Briscoe testified that he was a federal inmate at the time of trial, awaiting sentencing on a felon in possession of a firearm charge. He said that he was in the Montgomery County Jail in March 2007 on an aggravated burglary charge, which was nolle prossed because the victim was out of the country. Mr. Briscoe said that the state had not promised him anything in exchange for his testimony.

Allen Morris Bell testified that he did not know the defendant. He said that on March 21, 2007, he was at his home with his parents and siblings. Mr. Bell said that he was in jail for eighteen days in April 2007.

Sharon Bell testified that she was Allen Bell's mother. She testified that her son was at home with her and her husband on March 21, 2007.

Clarksville Police Detective Timothy Finley testified that he responded to 18B Lincoln Homes on March 21, 2007. He spoke with the defendant, who told him that the victim had fallen down the stairs. The defendant also told him that he was alone with the victim and the victim's sister at the time. On March 24, 2007, Detective Finley spoke with the defendant again, and the defendant repeated that the victim fell down the stairs. Detective Finley recalled that he specifically asked the defendant whether his son was present when the victim fell, and the defendant responded that his son was not in the house. On April 24, 2007, the defendant told Detective Finley that the victim was injured when Allen Bell broke into the house and tried to rob him. The defendant said that he was holding the victim when Mr. Bell grabbed him, and the victim's head hit the wall. He further said that both he and Mr. Bell fell on top of the victim in the course of a struggle. The defendant told the detective that he had not reported the robbery earlier because Mr. Bell had threatened to kill the victim's mother and the children if he told anyone. The defendant identified Mr. Bell's photograph from a set of four pictures. The defendant said that he had seen Mr. Bell in the jail and recognized him as the robber. Detective Finley confirmed that Mr. Bell was

in the jail and interviewed him on the same day that the defendant told him about the robbery. Detective Finley also spoke with Steven Briscoe. He traveled to Washington, D.C., in January 2009 to speak with Lopez, and he testified that he never developed probable cause to suspect Lopez of injuring the victim. Detective Finley testified that, to his knowledge, the defendant's allegation of a robbery was not publicized in the media.

On cross-examination, Detective Finley testified that the defendant did not appear to be under the influence of any drugs on March 21, 2007. Detective Finley recalled that the victim was pronounced dead on March 22, 2007. He agreed that the victim's mother's cell phone records were consistent with her making a call to the house at 12:07 p.m. He recalled that she told him that she spoke with both the defendant and the victim when she called the house at 1:43 p.m. Soon after that phone call, she received a call from the police about the victim.

Moctem'a Stevens testified that she was Lopez's mother. She lived in Washington, D.C., and was a police officer with the Metropolitan Police Department. Stevens testified that Lopez moved to Washington to live with her in March 2007. She originally enrolled him in a high school but then sent him to a military academy in Maryland in January 2009. He was scheduled to graduate in June 2009. Ms. Stevens testified that Lopez received a call from the defendant in March or April 2009. Lopez called her the same day and was upset about the conversation with his father because "he [did not] understand why he [could not] move forward with his life and do something positive without his father bothering him." Ms. Stevens said that Lopez did not graduate from the military academy and had run away from home after their "last conversation in reference to him coming to Tennessee to speak about his whereabouts."

David Marsh testified that he was Lopez's personal counselor at the military academy. He said that he received a call from a man purporting to be Lopez's father, and he thought that Lopez would want to talk to his father. Mr. Marsh said that Lopez did not want to talk to his father that day, but he did talk to him when the defendant called again one to two days later. Mr. Marsh said that Lopez was apprehensive prior to talking to the defendant and "visually upset" after the conversation. Mr. Marsh asked him what was wrong, and Lopez told him that "they [were] trying to say [he] hurt a baby." When Mr. Marsh asked him whether he had hurt a baby, Lopez responded that he had not.

Mary Davila testified that she was employed by the Clarksville Montgomery County School System. She acted as the liaison between the alternative school and a student's home and was the hearing officer who determined whether a student would be expelled from a school or admitted to an alternative school. She testified that in February 2007, Lopez's school recommended him for short term placement at the alternative school because of an accumulation of discipline points. Ms. Davila testified that the alternative school coordinator

recommended expelling Lopez from the alternative school on either March 15 or 16, 2007, because of boisterous conduct off campus at a soccer practice.

The defense called Angelina Richards, the victim's mother. She testified that she and the defendant were dating in March 2007 and that he and his son would occasionally spend the night at her house in Lincoln Homes. She had two children: the victim, who was almost two, and a daughter, who was six months old. Ms. Richards said that she trusted the defendant to care for her children when she went to work, but she recalled saying once that she did not want Lopez to be alone with them. Ms. Richards said that on March 21, 2007, she was called in early to work and asked the defendant to take her children to daycare. She called home around lunchtime and Lopez answered the phone.

On cross-examination, Ms. Richards agreed that the victim was healthy when she left for work but was brain dead by 4:00 p.m. She further agreed that when she called the defendant at 1:43 p.m., he told her that the victim was watching television. She said that the defendant told her several days later that someone tried to rob him on March 21.

Following the close of proof and arguments, the trial court found the defendant guilty of aggravated child abuse, a Class A felony, and felony murder. The court found him not guilty of aggravated child neglect. The trial court sentenced him as a violent offender to fifteen years for the aggravated child abuse conviction and to a life sentence for the felony murder conviction, to be served concurrently in the Tennessee Department of Correction.

**Analysis**

On appeal, the defendant argues that the evidence was insufficient to support his convictions. Specifically, he contends that the defendant was not the only person with access to the victim when the victim was injured, that the testimony of Mr. Briscoe was self-serving and unreliable, and that there was a material variance in the indictment and the proof at trial.

Our review begins with the well-established rule that once a jury, or in this case, the trial court, finds a defendant guilty, his or her presumption of innocence is removed and replaced with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992). Therefore, on appeal, the convicted defendant has the burden of demonstrating to this court why the evidence will not support the verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000); *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). To meet this burden, the defendant must establish that no "rational trier of fact" could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *State v. Evans*, 108 S.W.3d 231, 236 (Tenn. 2003); Tenn. R. App. P. 13(e). In contrast, the trial court's verdict accredits the state's witnesses and resolves all conflicts in favor of the state. *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992). The state is entitled to

the strongest legitimate view of the evidence and all reasonable inferences which may be drawn from that evidence. *Carruthers*, 35 S.W.3d at 558; *Tuggle*, 639 S.W.2d at 914. Questions concerning the credibility of the witnesses, conflicts in trial testimony, the weight and value to be given the evidence, and all factual issues raised by the evidence are resolved by the trier of fact and not this court. *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). We do not attempt to re-weigh or re-evaluate the evidence. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002); *Bland*, 958 S.W.2d at 659. Likewise, we do not replace the jury's inferences drawn from the circumstantial evidence with our own inferences. *See State v. Elkins*, 102 S.W.3d 581, 582 (Tenn. 2003); *Reid*, 91 S.W.3d at 277.

A defendant may be convicted on the basis of direct or circumstantial evidence or a combination of both. *State v. Winters,* 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003); *see also State v. Pendergrass,* 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). In fact, circumstantial evidence alone may be sufficient to support a conviction. *State v. Tharpe,* 726 S.W.2d 896, 899-900 (Tenn. 1987). Moreover, the state does not have the duty to exclude every other hypothesis except that of guilt. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (adopting the United States Supreme Court standard that the jury is only required to weigh evidence, whether direct or circumstantial, against the reasonable doubt standard); *see also State v. James*, 315 S.W.3d 440, 455 n. 14 (Tenn. 2010) (noting that federal courts have rejected the notion that the government has a duty to exclude every other hypothesis save that of the defendant's guilt). "Circumstantial evidence in this respect is intrinsically no different from testimonial evidence." *Holland v. United States*, 348 U.S. 121, 140 (1954). Therefore, when considering the sufficiency of evidence, we treat direct and circumstantial evidence the same.

To sustain the defendant's conviction for aggravated child abuse, the state had to prove that the defendant committed the offense of child abuse, and the conduct resulted in serious bodily injury to the child. *See* Tenn. Code Ann. § 39-15-402(a)(1). Child abuse occurs when a person "knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury." *Id.* § 39-15-401(a). Bodily injury includes "a cut, abrasion, bruise, burn or disfigurement, and physical pain or temporary illness or impairment of the function of a bodily member, organ, or mental faculty . . . ." *Id.* § 39-11-106(a)(2). "'Serious bodily' injury means bodily injury that involves: [a] substantial risk of death; [p]rotracted unconsciousness; [e]xtreme physical pain; [p]rotracted or obvious disfigurement; or [p]rotracted loss or substantial impairment of a function of a bodily member, organ or mental faculty[.]" *Id.* § 39-11-106(a)(34)(A)-(E).

Relevant to this case, felony murder is the killing of another committed in the perpetration of aggravated child abuse. Tenn. Code Ann. § 39-13-202(a)(2). A murder qualifies as felony murder if the underlying felony is closely connected to the killing in time, place, causation, and continuity of action. *State v. Pierce*, 23 S.W.3d 289, 295 (Tenn. 2000).

Proof of the intention to commit the underlying felony and at what point it existed is a question of fact to be decided by the trier of fact after consideration of all the facts and circumstances. *State v. Buggs*, 995 S.W.2d 102, 107 (Tenn. 1999).

Taken in the light most favorable to the state, the evidence at trial showed that the defendant was alone with the victim, a twenty-two month-old child, and the victim's sister, a six month-old child, at or around 2:00 p.m. on March 21, 2007, when the child sustained injuries that led to his death on March 22, 2007. The medical evidence showed that the victim received injuries to his head and body that could not have been sustained by falling down the stairs. The defendant's version of how the victim was injured varied from an accident, to a robbery gone bad, to his son's being responsible; however, a fellow inmate, Steven Briscoe, testified that the defendant confessed to him that he slammed the victim onto the floor, kicked him, and hit him. The trial court, by its verdict, accredited the testimony of Mr. Briscoe. The medical evidence, combined with Mr. Briscoe's testimony and the negation of the defendant's alternative theories, was sufficient for any rational trier of fact to find the defendant guilty of aggravated child abuse and felony murder. As to the allegedly material variance between the indictment and the proof at trial, the proof at trial was that the victim was declared dead on March 22, 2007, as the indictment alleged. Therefore, we conclude that the evidence was sufficient to sustain the defendant's convictions.

## Conclusion

Based on the foregoing reasons, we affirm the judgments of the trial court. However, we remand the matter to the Circuit Court of Montgomery County for entry of a corrected judgment form to properly reflect the defendant's life sentence for the felony murder conviction.

_____
J.C. McLIN, JUDGE